CLERK'S OFFICE U.S. DIST. COURT
AT DANVILLE, VA
FILED
APR 18 2005
JOHN F. CORCORAN, CLERK
BY: H McDonald
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
DANVILLE DIVISION

| | |
|---|---|
| JOHN WITTEN TUNNELL,<br><br>*Plaintiff,*<br><br>v.<br><br>FORD MOTOR COMPANY,<br><br>*Defendant.* | CIVIL ACTION NO. 4:03-CV-00074<br><br>MEMORANDUM OPINION<br><br>JUDGE NORMAN K. MOON |

The Court has before it several motions *in limine* in the above-titled matter involving Plaintiff John Witten Tunnell ("Tunnell") and Defendant Ford Motor Company ("Ford"). First, the Court considers Tunnell's Motion to Preclude Ford Motor Company from Utilizing Testimony From Elizabeth Holt-Wright (docket no. 304). Second is Ford's Motion to Exclude Evidence Regarding Battery Disconnect Devices Which Post Date the Subject Vehicle (docket no 326). Third is Tunnell's Motion for an Instruction to Counsel to Avoid Improper Arguments Not Supported by the Evidence in this Case (docket no. 328). Fourth is Ford's Motion to Allow the Admission of Seat Belt Evidence (docket no. 334). Fifth is Ford's Motion to Exclude Evidence of and/or References to the "Ford EV Ranger," the "Ford Ecostar," and the "Battery Safety Terminal" (docket no. 340). Sixth is Tunnell's Motion to Exclude Evidence of Plaintiff's Use of Cocaine and Marijuana (docket no. 352). Seventh and finally, the Court considers

1

Ford's Motion to Exclude the Draft "Collision and Non-Collision Fire Potential Campaign and Prevention Report" (docket no. 378). The Court will discuss these motions in turn.

First, Tunnell moves to prevent Ford from utilizing the testimony of Elizabeth Holt-Wright. Ms. Holt-Wright is a licensed social worker who counseled Plaintiff after the accident, meeting Tunnell for approximately one hour once a week from approximately October 16, 2002 to January 21, 2003. She discussed Tunnell's emotional state with him in light of the accident. Although she has testified that crash-related factors have impacted Tunnel's mental state, she also has indicated that other family issues, not related to the crash, also may have impacted him. Tunnell argues that any evidence offered by Ms. Holt-Wright would be irrelevant because it goes to specific mental conditions not at issue in this case and because, being of a highly personal nature, it could only be used by Ford to embarrass Tunnell. The Court disagrees. Tunnell has argued that he has suffered "mental anguish" from the accident that in part has rendered him less capable of performing daily tasks and maintaining full-time employment. As Tunnell's emotional state will be a significant factor in the damages Tunnell seeks, Ford is entitled to present theories as to alternative sources of his emotional difficulties. To the extent that this evidence may be prejudicial, the Court finds that the prejudice does not outweigh its probative value. Nevertheless, seeing as this evidence only goes to the extent of the damages that Tunnell has suffered, Ford only will be permitted to present this evidence with regard to damages.

Second, Ford moves *in limine* to exclude evidence regarding battery disconnect devices that post-date the design or manufacture of the Ford Mustang at issue. At issue are two devices designed to disconnect vehicle battery circuits, one developed by First Inertia and the other developed by Tyco. The First Inertia device could not have been available for installation in a
2

production vehicle until January 2000 at the earliest, and in fact it never made it to production for Ford because the device failed to meet its goals. The Tyco device was not offered for sale before the year 2000 either. Thus, both switches post-date the design and manufacture of the Mustang at issue. Ford argues that such evidence is irrelevant because at the time of the Mustang's manufacture, "[n]o production-ready battery disconnect switch which could be installed in a production vehicle was available to Ford before that time." Tunnell responds in part that even if true, Ford's claim does not prevent Tunnell from presenting evidence of post-date battery disconnect devices to show that a reasonable alternative design was feasible and available at the time. The Court agrees. To be sure, in a breach of implied warranty action, the reasonableness of a defendant's conduct is to be judged at the time of the manufacture of the product, not at the present. *See Mondshour v. General Motors Corp.*, 298 F.Supp. 111, 114 (D.C. Md 1969); *Cox v. General Electric Co.*, 302 F.2d 389 (6th Cir. 1962). Nevertheless, this requirement does not prevent a plaintiff from using relevant evidence of any kind, including post-manufacture evidence, to demonstrate that feasible alternative designs existed at the time of the manufacture. *See* F. R. Evid. 407 ("This rule does not require the exclusion of evidence of subsequent measures when offered for . . . feasibility of precautionary measures . . ."); *cf. Estate of Bernard C. Kimmel v. Clark Equipment Co.*, 773 F.Supp. 828, 831 (W.D. Va. 1991). Of course, such evidence truly must be legally relevant to be admissible, and the mere fact that such post-manufacture safety devices now exist, standing alone, does not make them relevant. For such evidence to qualify, Tunnell would need to lay a proper foundation that, as he has argued, they "are simply another chapter in the continuum of knowledge that Ford had about battery disconnect devices and battery disconnect technology since at least 1968." (Tunnell Br. at 13.)

3

Such evidence would include, as Tunnell has suggested in his brief, that the First Inertia device is almost identical to one that Ford engineers contemplated and described in a draft response to the National Highway and Traffic Safety Administration's ("NHTSA") 1995 response request on battery disconnect devices. With this proviso, the Court shall deny Ford's motion *in limine* and shall consider allowing evidence of post-manufacture battery disconnect devices.

Third, Tunnell moves to prevent Ford from making allegedly improper statements at trial alluding to Tunnell's "heavy drinking," Tunnell's "beer run" to North Carolina, Blake Athey's act of driving like "a madman attempting to beat the clock to North Carolina," and the presence of "a drunken group of partiers" at the trailer park. Plaintiff argues that each of these phrases are prejudicial and not relevant to the issues in the case. As an initial matter, the Court agrees with Ford's argument that no legal authority exists for the Court to censor in advance the words Ford is ultimately permitted to use in describing the evidence that it presents at trial when it is not yet clear whether the evidence will support those descriptions. As the evidence unfolds during trial, both parties will have ample opportunity to object to descriptions that mischaracterize that evidence. It would not be useful for the Court to consider motions *in limine* seeking to prevent every unflattering description that conceivably could be heard at trial. For this reason, the Court will deny Tunnell's motion to prevent Ford from making the named descriptive characterizations. Nevertheless, the Court cautions both parties to provide accurate descriptions of the evidence at trial. Based on the current record, nothing yet supports Ford's claim that the group at the party was "drunken," that Tunnell and Athey had engaged in "heavy drinking," or that Athey was driving like "a madman." Before supporting evidence has been laid, such characterizations would be improper. Thus, for example, Ford may not use these characterizations in its opening

4

statement, where such terms would be purely argumentative and inflammatory. At the same time, the term "beer run" is an accurate description of trip by Athey and Tunnell to North Carolina, even if not flattering. It is not contested that Athey and Tunnell were traveling to North Carolina expressly for the single purpose of buying beer. For this reason, Ford shall be permitted to use this term in describing their trip.

Fourth, the Court considers Ford's Motion to Allow the Admission of Seatbelt evidence. Ford argues that it should be entitled to present evidence of Tunnell's failure to use a seatbelt during the crash that gave rise to the post-collision fire at issue in this case. The Virginia code specifically provides that a violation of the seatbelt statute "shall not constitute negligence, be considered in the mitigation of damages," or be admissible in evidence "in any action for the recovery of damages arising out of the operation, ownership, or maintenance of a motor vehicle," Va. Code Ann. § 46.2-1094(D) (Michie 2000). It further provides that failure to wear a seatbelt "shall not be deemed negligence" or "considered in mitigation damages of whatever nature." Va. Code Ann. § 46.2-1092 (Michie 2000).[1] Nevertheless, Ford argues that these state statutes, which are in derogation of Virginia common law, do not apply here. First, Ford claims that § 46.2-1094(D) does not apply in this context, because it only applies to damages actions arising

---

[1] Va. Code § 46.2-1092 provides in relevant part: "Failure to use the safety lap belts or a combination of lap belts and shoulder harnesses after installation shall not be deemed to be negligence. Nor shall evidence of such nonuse of such devices be considered in mitigation of damages of whatever nature." Va. Code Ann. § 46.2-1092 (Michie 2000).
  Va. Code § 46.2-1094(D) provides: "A violation of this section shall not constitute negligence, be considered in mitigation of damages of whatever nature, be admissible in evidence or be the subject of comment by counsel in any action for the recovery of damages arising out of the operation, ownership, or maintenance of a motor vehicle, nor shall anything in this section change any existing law, rule, or procedure pertaining to any such civil action." Va Code Ann. § 46.2-1094(D) (Michie 2000).

5

out of "the operation, ownership, or maintenance" of vehicles, not product liability cases—which some state courts have held to be substantially different. *See Kline v. Mitsubishi Motors Corp.*, 556 N.W.2d 528 (Mich. App. 1996), *aff'd* 581 N.W.2d 272 (1998). Ford also notes that § 46.2-1094(D) only specifically excludes particular uses of "a violation of this section," and that actual seatbelt non-use is not excluded under the statute. In light of this limited substantive language, Ford argues that the statute should be read narrowly pursuant to *Brown v. Ford Motor Co.*, 67 F.Supp. 2d 581 (E.D. Va. 1999) (holding that a federal court was not bound to exclude seatbelt nonuse evidence for certain purposes). Despite Tunnell's argument to the contrary, this conclusion in *Brown* was not disturbed on appeal by the Fourth Circuit's unpublished affirmance.[2] Second, Ford argues that § 46.2-1092 was only designed to prevent seatbelt non-use from being evidence of negligence or of mitigation of damages, which impliedly leaves open its use for issues such as causation and design defect. *See generally Wilson v. Volkswagen of Am., Inc.*, 445 F. Supp. 1368, 1373 (E.D. Va. 1978) (holding that in a product defects and negligent design case, evidence that an automobile was equipped with seatbelts was admissible for determining whether the automobile was defectively designed) (superceded for other purposes by

---

[2] In reviewing the meaning of § 46.2-1094(D), the Fourth Circuit stated that "[o]n balance . . . the better interpretation of this phrase is as a reference to an official determination that the provision has been violated." *Brown v. Ford Motor Co.*, 10 Fed Appx. 39; 2001 U.S. App. LEXIS 4539 at *42 (March 23, 2001) (unpublished). It therefore concluded that the statute "as a whole is most appropriately understood as forbidding only admission into evidence or comment upon an official determination that the section was violated, and at most as forbidding admission of or comment upon evidence that would be sufficient to establish all of the elements of a violation of the section." *Id.* Contrary to Tunnell's claim, Ford here only seeks to present evidence of seatbelt non-use, which does not by itself constitute all of the elements of a violation of § 46.2–1094(D). Indeed, the Fourth Circuit specifically explained that "evidence of mere seat belt nonuse, in and of itself, in no sense at all constitutes evidence of 'a violation' of the statute." Id. Therefore, although the Fourth Circuit's unpublished opinion is not binding authority, this Court nevertheless finds that it is consistent with Ford's position.

6

Va. Code § 46.2-1094(D)).

As a preliminary matter, the Court agrees with Ford that under current case law, the Virginia statutes do not prevent the presentation of non-seatbelt use evidence for issues such as "negligent design and manufacture, breach of warranty, and product misuse." *Brown v. Ford Motor Co.*, 67 F.Supp. 2d at 587. Because § 46.2-1094(D) and § 46.2-1092 are in derogation of Virginia common law, they should be strictly construed, and a federal court sitting in diversity should only apply those provisions that are substantive. *Id.* Although § 46.2-1094(D) substantively provides that a seatbelt violation cannot be used in support of a defense to liability or in mitigation of damages, *see Freeman v. Case Corp.*, 924 F.Supp. 1465, 1469–70 (W.D. Va. 1996), *rev'd and remanded on other grounds*, 188 F.3d 1011 (4th Cir. 1997), its other provisions concern the admissibility of seatbelt evidence, and thus are non-binding procedural law. *Brown*, 67 F.Supp. 2d at 586–87. Similarly, the substantive provisions of both § 46.2-1094(D) and § 46.2-1092 only prevent use of sea seatbelt non-use evidence for establishing contributory negligence or mitigation of damages, which impliedly leave such evidence available for other purposes. For these reasons, this Court finds that seatbelt non-use evidence can be used as evidence regarding causation, design defect, and breach of warranty. Therefore, as applicable here, such evidence theoretically would be admissible to demonstrate that Tunnell's seatbelt non-use: (1) was the proximate cause of the injuries he allegedly received due to a vehicle's design defect; or (2) was an "unforeseeable misuse" of the vehicle that would forfeit a breach of warranty claim.

Although seatbelt non-use evidence is *theoretically* admissible for these purposes, at this point, the Court nevertheless is unwilling to admit it. Nothing in *Brown* undermines the basic

7

principle that evidence is only admissible when relevant. Accordingly, before seatbelt non-use evidence can be admitted as evidence, *Wilson* requires that Ford demonstrate "by competent and satisfactory evidence, the extent that plaintiff's injuries could have been avoided by wearing a seat belt." *Wilson*, 445 F. Supp. at 1373. At this stage, Ford simply has not done so. To date, it has not provided any evidence that Tunnell's failure to use a seat belt caused any of the severe burn injuries that he received after the accident while his legs were trapped in the crush damage of the car.

Ford insists that many cases have allowed seatbelt non-use evidence to be relevant to issues of causation and design defect. Unlike the cases Ford cites in its brief, however, this case concerns an alleged defect in Ford's *post-collision* safety designs, which exist to protect a passenger from injuries that could be sustained *after* the accident. Seatbelts, however, generally protect passengers from injuries incurred *during* an accident. For this reason, it is difficult to see why seatbelt non-use evidence would tend to undermine Tunnell's claims of negligent design or breach of warranty concerning post-collision safety. *Cf. Brown*, 67 F. Supp.2d at 582; *Klinke*, 458 Mich. at 586. Although it is possible to envision scenarios in which failure to wear a seatbelt allowed Tunnell's legs to become trapped when they otherwise would not have been, thereby causing or exacerbating his injuries in the post-collision fire, such scenarios are at this point far-flung and speculative. Therefore, until evidence is provided showing that seatbelt evidence truly would be relevant, the Court declines to grant a motion *in limine* declaring that such evidence is admissible. *See Garrett v. Desa Industries, Inc.*, 705 F.2d 721 (4th Cir. 1983) (holding a plaintiff "may not introduce evidence of the nonuse [of safety goggles] unless and until it demonstrates the extent to which Garrett's injuries could have been avoided by wearing

8

safety goggles"). This prohibition applies to all of the uses for which Ford would offer it, including attacking Tunnell's theory of causation and establishing that Tunnell's actions were an unforeseeable misuse.

For the same reasons, unless Ford can establish some causal relationship between the seatbelts and the general post-collision safety of the car, Ford also shall not present evidence of the fact that the Mustang was even *equipped* with seatbelts. It is true that in defective design cases, evidence of the presence of seatbelts may be useful in establishing an automobile's total design package for collision safety. *See Brown*, 67 F. Supp.2d at 582; *Klinke*, 458 Mich. at 586. That same evidence, however, may not be useful in establishing an automobile's total design package *post-collision* safety, simply because it many not have any bearing on post-collision safety. Unless a given safety device can be shown to be part of the relevant safety package at issue, it is not relevant evidence. Thus, Ford shall not be allowed to present evidence of the presence of seatbelt unless and until it demonstrates that seatbelts are a relevant portion of Ford's post-collision safety package.

Fifth, Ford moves to exclude evidence and references to the Ford EV Ranger, the Ford Ecostar, and a Battery Safety Terminal used by BMW. The EV Ranger and the Ecostar are both discontinued electric cars that Ford produced containing a disconnect switch that operates to shut down the high-voltage traction battery that powers the vehicles in the event of a collision. The BMW Battery Safety Terminal contains a disconnect switch that, upon collision, severs the battery cable running between the battery and the starter and generator, all of which are located in the engine compartment. Ford argues that the disconnect device on the Ford cars is irrelevant because it was designed to comply with Federal Motor Vehicle Safety Standard 305, 49 C.F.R. §

9

571.305 (2002), which was intended to protect passengers of electric vehicles from the risk of electrolyte spillage from propulsion batteries and electrical shock. Because the regulation was created for electric cars, which produce unique risks to consumers, Ford argues that the devices conforming to that regulation are not relevant because "they seek to protect against hazards totally unrelated" to those in this case. Similarly, Ford argues that BMW's device is also irrelevant because it was designed to protect against short-circuiting of the high-amp starter circuit upon collision, rather than to cut power to occupant compartment and wiring harnesses of the car, and therefore the device would not have prevented the fire at issue in this case. Even accepting the factual basis of these arguments, however, the Court finds that the devices are relevant to the issue of the availability and the feasibility of "alternative designs" that could be incorporated into the Mustang to protect against the electrical fires currently at issue. Tunnell plans to argue that Ford had knowledge that such inertia switches, which it had used to safeguard the fuel pump circuit on all Ford vehicles since 1980, could be used as battery disconnect devices on combustion vehicles. Indeed, Tunnell claims that the very disconnect switch that Ford uses to safeguard its fuel pump circuits is the same one it used to safeguard the traction battery in its electric vehicles, suggesting that the switch could easily have been used on a traditional 12-volt battery circuit in a combustion vehicle. For this reason, even if the devices at issue have been used to protect against other risks, evidence of their existence and use in other car systems is relevant. The Court is also not persuaded that the prejudicial effect of such evidence outweighs its probative value under Rule 403 of the Federal Rules of Evidence. Accordingly, Ford's motion will be denied.

Sixth, the Court considers Tunnell's Motion to exclude evidence of his use of cocaine and

marijuana. At this stage, there is no evidence that Tunnell used either of these drugs or indeed any illegal substances in the days preceding the accident. Ford argues that evidence of Tunnell's drug use would go to Tunnell's credibility and, in considering damages, to Tunnell's wage loss and life expectancy. The Court accepts Ford's argument only in part. For the purpose of credibility, the Court will exclude any extrinsic evidence of drug use, as well as any inquiry into that drug use on cross examination. While the Federal Rules of Evidence do allow impeaching a civil witness with extrinsic evidence of certain past criminal convictions, *see* Fed. R. Evid. 609(a), they do not allow doing so with extrinsic evidence of mere bad acts. *See* Fed. R. Evid. 608(b). Further, while a party may inquire on cross examination into a witness's past acts, including drug use, it may only do so if those acts are if probative of truthfulness. *Id*. When the underlying case involves drugs, drug use may indeed be probative of a witness's truthfulness. *See United States v. Banks*, 520 F.2d 627, 630–31 (7th Cir. 1975) (holding that past drug use by a government informant making a drug buy may be relevant to assessing informant's credibility, and despite the possibility of prejudice, the defense should have been permitted to inquire into it); *United States v. Palmer*, 691 F.2d 921, 922–23 (9th Cir. 1982) (holding that when a dentist is charged with obtaining cocaine by misrepresentation, his past use of cocaine is probative of truthfulness given his suggestion that he has never used it). However, if the past drug is does not shed light on credibility, it properly may be excluded. *See Bennett v. Longacre*, 774 F.2d 1024, 1027 (10th Cir. 1985) (holding that in a vehicle liability case, questions regarding defendant's prior use of marijuana and alcohol were properly disallowed because they did not shed light on credibility); *United States v. Bentley*, 706 F.2d 1498, 1510 (8th Cir. 1983). Therefore, for the purposes of credibility, Ford may not use extrinsic evidence to prove Tunnell's past drug use or

11

even inquire about it on cross examination. For the purposes of attacking wage loss and life expectancy, however, the Court agrees with Ford that such evidence should not be excluded *in limine*. Drug use, if significant, is capable of decreasing a person's wage earning capacity and life expectancy. If Ford is able to present demonstrate that Tunnell's past drug use will have a discernible effect on his future wages and life expectancy, the Court would be willing to admit such evidence on the damages issue. Accordingly, the Court shall grant Tunnell's motion in part, excluding evidence of Tunnell's past drug use *in limine* only for the purpose of credibility.

Seventh and finally, Ford moves to exclude *in limine* the Draft Collision and Non-Collision Fire Potential Campaign and Prevention Report. Ford argues that the report addresses only potential "fuel fires" and "non-collision related" fires, and therefore does not pertain to "collision-related electrical fires," which are the subject of this case. This Court is unconvinced that this intricate distinction has any bearing whatsoever on admissibility. By its own terms, this report provides evidence of Ford's knowledge relating to "Collision and Non-Collision Fire Potential." It addresses a variety of wiring issues that may be relevant to the August 27, 2004 Order allowing admission of evidence concerning "whether the electrical system can be the ignition source for motor vehicles." The report also directly addresses its knowledge of potential consumer expectations that the electrical system would not be an ignition source for a collision fire. Accordingly, the motion shall be denied.

An appropriate Order shall issue.

12

ENTERED: *[signature]*
U.S. District Judge

4/18/05
Date