CLERK'S OFFICE U.S. DIST. COURT
AT LYNCHBURG, VA
FILED
for Danville
JUN 27 2005
JOHN F. CORCORAN, CLERK
BY: Fay Coleman
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
DANVILLE DIVISION

| | |
|---|---|
| JOHN WITTEN TUNNELL,<br><br>*Plaintiff,*<br><br>v.<br><br>FORD MOTOR COMPANY,<br><br>*Defendant.* | CIVIL ACTION NO. 4:03-CV-00074<br><br>MEMORANDUM OPINION<br><br>JUDGE NORMAN K. MOON |

On June 11, 2005, upon the close of Plaintiff's evidence at trial, Defendant moved for a directed verdict. Because the Court agrees that Plaintiff cannot establish a necessary element of Plaintiff's cause of action, Defendant's motion shall be granted.

I.

On November 18, 1999, Plaintiff John Witten Tunnell was a passenger in a 1999 Ford Mustang operated by Blake Warren Athey ("Athey") on State Route 609, in Henry County, Virginia. Athey lost control of the Mustang and struck a utility pole. Plaintiff could not be removed from the Mustang after the accident because his legs were trapped in the crush damage. Several minutes after the collision, a fire started somewhere near the dash of the Mustang, which spread throughout the interior of the vehicle until Plaintiff was engulfed in fire. Plaintiff suffered

1

extensive burns, which required above-the-knee amputations of both of his legs. He also suffered brachial plexus injuries to his upper extremities when rescue personnel attempted to pull him from the burning vehicle.

Plaintiff alleges that the 1999 Mustang was defective in design and unreasonably dangerous because the Mustang was not equipped with a battery cutoff device ("BCO") or a similar device, which would eliminate electrical ignition sources for a post-collision fire. At trial, Plaintiff presented evidence from several experts, including Charles Crim and Jerry Wallingford. At the close of Plaintiff's evidence, Defendant moved to strike the expert testimony of Plaintiff's expert Jerry Wallingford. Defendant also moved for a directed verdict, claiming the Plaintiff cannot establish essential elements of his case.

II.

A preliminary issue to be addressed is Defendant's Motion to Strike the Testimony of Plaintiff's Expert, Jerry Wallingford. Prior to trial, Plaintiff designated Wallingford as an expert, which Defendant opposed. At a *Daubert* hearing, the Magistrate Judge concluded that Wallingford's expert testimony should be permitted regarding certain points but not others. This Court subsequently adopted the Magistrate's recommendations as to Wallingford. Nevertheless, a court's obligation to serve as a gatekeeper for expert testimony under *Daubert* is ongoing, and if at any time a court concludes that proffered expert testimony is not proper, it must exclude it. After hearing Wallingford's testimony at trial, the Court has concluded that on at least one significant point, Wallingford's testimony did not measure up to what was promised at his *Daubert* hearing. Specifically, for the reasons discussed below, Wallingford did not demonstrate at trial that he was qualified to give expert testimony regarding the issue of defectiveness. For

2

this reason, the Court has determined that this portion of Wallingford's testimony must be excluded.

Where expert opinion evidence is proffered in litigation, courts have an obligation to serve as gatekeepers to determine whether that expert opinion is grounded in objective underlying scientific methodology as opposed to mere speculation or conjecture. *Daubert v. Merill Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 593 (1993). In doing so, courts must make "a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and whether that reasoning can be applied to the facts at issue." *Id.* at 592–93. Unsupported expert opinions are excluded as evidence because "nothing in the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert." *General Electric Co. v. Joinder*, 522 U.S. 136, 146 (1997).

In determining whether the methodology or technique underlying the formation of an expert's opinion is reliable, the court *may* consider several factors in a flexible manner depending on the particular circumstances of each case, as there are numerous types of expertise. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150–51 (1999). These factors include: "[1] Whether a 'theory or technique . . . can be (and has been) tested'; [2] Whether it 'has been subjected to peer review and publication'; [3] Whether, in respect to a particular technique, there is a high 'known or potential rate of error' and whether there are 'standards controlling the technique's operation'; and [4] Whether the theory or technique enjoys general acceptance within a relevant scientific community." *Id.* at 149–50 (citing *Daubert*, 509 U.S. at 592–94). The *Daubert* court emphasized that its list of factors was not definitive and that no single factor by itself was

3

determinative. *Daubert*, 509 U.S. at 593. Instead, the Court emphasized that the analysis is a "flexible one," *id.* at 594, and that "many factors will bear on the inquiry." *Id.* at 593. As a result, courts applying the *Daubert* standard have identified other factors that are relevant to the analysis. *See, e.g., In re Paoli R.R. Yard PCN Litig.*, 35 F.3d 717, 742 n.8 (3d Cir. 1994) (identifying additional factors to consider, such as the non-judicial uses to which the method has been put).

Wallingford's testimony at trial demonstrated that at least a portion of his expert opinion evidence must be excluded. During his testimony, Wallingford attempted to offer expert testimony on the issue of whether the Mustang contained a defect that rendered it unreasonably dangerous for ordinary use or foreseeable misuse. All of his testimony on this issue, however, fails the basic standards of *Daubert* and its progeny. His opinions on this topic contain so many inconsistencies, dubious methods, and unsupported conclusions that they are devoid of value to a fact finder.

The first flaw in Wallingford's testimony regarding defectiveness could not be more fundamental, for it strikes at the very heart of his expert opinion. Although Wallingford claimed in his direct examination that the lack of a BCO was a defect, he effectively conceded the exact opposite on cross examination. He stated that his testimony was actually only intended to indicate that the BCO would have made vehicles safer, and that ultimately, the absence of such a device actually is *not* a defect:

> Q: Yesterday, and on your direct examination, I believe that ultimately *what you were saying is that the lack of a battery cutoff switch, in your opinion, even though you haven't done these failures mores and effects analysis, or evaluated the risks that I was just talking about, but nevertheless, you said in your opinion that the lack of a battery cutoff is a defect in a vehicle?*

4

| | |
|---|---|
| *A:* | *Yes.* |
| Q: | Do you remember being asked the same question in deposition in this case? |
| A: | Yes. |
| Q: | And do you remember on March 7th, 2003, you were asked that question? |
| A: | Just a moment. If you could tell me the page and line number. |
| Q: | I'll refer you to page 26, to lines 10 and 11. You were asked whether cars that don't have battery cutoffs are defective? And did you say, among other things, "I'm not going to call it defective." |
| A: | Yes, sir. Explaining previous verbiage, that's what I said on that page and that line. |
| Q: | Let's read your whole answer. |
| . . . | |
| Q: | Question: "And like you said the last time, if the Ford's defective then for not having a BCO, they all are?" And your answer: "No, I did not. *I'm saying I'm not going to call it defective.* I'm saying this accident, the trauma that occurred to Mr. Tunnell, was because these—there was not a BCO vehicle, BCO system in that, battery cutoff system. *I'm saying it would have been a safer vehicle. My vehicle, your vehicle. Mr. Smith's vehicle, if it was equipped with a BCO. I'm not going to stand here and say that every vehicle that doesn't have one is defective.*" That's what you said? |
| A: | Yes, that's correct. |
| Q: | *Have you changed that opinion—* |
| A: | *No, sir,* I think I indicated— |

(Wallingford Trial Test. of 6/8/05) (emphasis added). This admission on cross examination effectively concedes the entire purpose of Wallingford's expert testimony on this topic, for it admits that his earlier statements were never meant to assert that the absence of Plaintiff's BCO actually constitutes a vehicle defect. A mere claim that a vehicle might be safer with a battery cutoff device does not address the distinct and much more serious question of whether vehicles without such devices are defective. Although a manufacturer has a duty to design a product that is reasonably safe for foreseeable use, the manufacturer is not required to design "the best possible product." *Sexton v. Bell Helmets*, 926 F.2d 331, 336 (4th Cir. 1991) (quoting *Jones v.*

5

*Hutchinson Mfg., Inc.*, 502 S.W.2d 66, 69 (Ky. 1973)). Some products, no matter how carefully manufactured, are inherently dangerous, and virtually every product is capable of causing injury. *Id.* Therefore, Wallingford's assertion that the Ford would be merely "safer" with a BCO is not germane. Because Wallingford explicitly rejected the notion that the Mustang at issue was defective, his expert testimony cannot be offered for this proposition.

Moreover, even if the Court were to assume *arguendo* that Wallingford's testimony does not admit the absence of a defect—but rather was merely inconsistent on this issue—his opinion still would not pass muster as expert testimony. First, even bracketing his inconsistencies, Wallingford's particular claim regarding the defectiveness of the Mustang is legally insufficient to establish a defect. At the end of his cross examination, Wallingford stated that although he could not say all vehicles lacking a BCO were defective, he could say that the absence of a BCO in Plaintiff's Mustang was a defect *in this particular accident*. This conclusion entirely misses the mark in a defect analysis. An automaker does not have the luxury of foreseeing the particular fate that will befall each of its vehicles, and then individually designing each vehicle specifically to guard against the risks of its future accidents. Rather, an automaker must create a vehicle design that reasonably protects against the host of accidents that could potentially occur to any of its vehicles. Thus, in determining whether a vehicle is defective, an expert cannot make a judgment based on a particular accident, but must analyze whether the vehicle taken as a whole was unsafe for reasonable uses. Wallingford's claim regarding defectiveness is similar to arguing that a crashed vehicle would have been better served by having its engine on the roof rather than under the hood—potentially true, but useless from a design perspective. Because Wallingford's conclusion is meaningless, it is of no value on the issue of defectiveness.

6

Second, and equally significant, Wallingford's testimony demonstrated that he had no scientifically valid methodology for coming to his conclusions regarding defectiveness. It is a fundamental precept of all expert testimony that it must be grounded in some objective underlying scientific methodology. *Daubert*, 509 U.S. at 592–93. Here, Wallingford's testimony on the issue of a defect badly fails this test. In determining whether the absence of a device in a product renders that product unreasonably dangerous, as a matter of common sense such analysis involves two questions. The first is whether the device, if present, truly would provide some safety benefit. The second is whether the safety benefit of the device would outweigh any additional risks that the device created. Only after satisfying both of these steps can an analyst reasonably conclude that the device, *taken in the whole*, is actually desirable and that its absence in a product truly renders the product unreasonably dangerous. Although Wallingford did provide testimony as to the potential benefits of the BCO by opining that the device was feasible and would have prevented the injury at issue, he completely ignored the second step in the analysis. Indeed, Wallingford acknowledged that the inclusion of a battery cutoff device, even when it protected certain "critical circuits" in a vehicle, potentially posed a variety of safety concerns that could result in injury and death. Specifically, he acknowledged that various circuits that he had not identified as critical—including a dome light, car horn, tail lights, radio, and power point—potentially provided significant safety benefits that would be lost due to operation of his proposed BCO. Yet when Wallingford was examined as to the potential risks that the BCO posed, he specifically stated on cross examination that he did not analyze this issue, that he did not attempt to analyze it, and that he was not qualified to analyze it. Although he offered the constant refrain that "I am not a statistician," Wallingford needed to perform some

7

quantitative analysis before he could opine that the Mustang was defective for lacking his proposed BCO.

Furthermore, Wallingford's methods for determining that the Mustang was defective also fail many of the explicit factors regarding expert opinion established through *Daubert* and its progeny. First, Wallingford was unable to testify that his theory regarding the Mustang "has been subjected to peer review and publication," *Daubert*, 509 U.S. at 593, because he declined to expose it to the rigors of those processes. *See Mitchell v. Gencorp, Inc.*, 165 F.3d 778, 783 (10th Cir. 1999) ("By failing to subject their opinions to peer review, the experts missed the opportunity to have other scientists review their work and warn them of possible flaws in their methodology."). Similarly, Wallingford did not test the results of his alternative design to determine a "known or potential rate of error," *Daubert*, 509 U.S. at 594. Because he did not do so, it is impossible to know how successful his alternative design would be on street-ready vehicles. Further, Wallingford's theories are also not generally accepted within the scientific community. *Id.* Finally, Wallingford is one of a class of experts who are not "proposing to testify about matters growing naturally and directly out of research they have conducted independent of the litigation, . . . [but] have developed their opinions expressly for the purposes of testifying." *Daubert v. Merill Dow Pharmaceuticals, Inc.*, 43 F.3d 1311, 1317 (9th Cir. 1995). Here, Wallingford prepared his analysis solely for his testimony in the case and has not conducted research on this topic independently. As such, the reliability of his methods and the value of his testimony are even further discounted.

For all these reasons, Wallingford lacked a sound scientific basis for his expert opinion on the issue of defectiveness. Accordingly, all of his expert testimony on this issue shall be

8

excluded.

III.

In light of the exclusion of Wallingford's testimony regarding the issue of defectiveness, the Court now turns to the issue of the directed verdict. A motion for a directed verdict, or judgment as a matter of law, may be made after "a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue." Fed. R. Civ. P. 50(a)(1). In considering such a motion, a court must consider the evidence "in its aspect most favorable to the party against whom the motion is made, with every fair and reasonable inference which the evidence justifies." *Mandro v. Vibbert*, 170 F.2d 540, 541–42 (4th Cir. 1948) (citations omitted). *See also Smitty Baker Coal Co. v. United Mine Workers*, 457 F. Supp. 1123 (W.D. Va. 1978), *aff'd* 620 F.2d 416 (4th Cir. 1980).

At trial, Plaintiff argued that the Ford Mustang at issue was defective because it was not equipped with a BCO, which would have operated in the accident to prevent the ignition of a post-collision fire by damaged electrical components. In a breach of warranty action, a plaintiff is required to prove that: (1) the product contained a defect that rendered it unreasonably dangerous for ordinary or foreseeable use; (2) the defect existed when the goods left the defendant's hands; and (3) the defect actually caused plaintiff's injuries. *McAlpin v. Electric Furnace Co.*, 1996 U.S. Dist. LEXIS 12618 (W.D. Va. 1996) (citing *Logan v. Montgomery Ward & Co., Inc.*, 216 Va. 425, 428 (1975)). *See also Chestnut v. Ford Motor Co.*, 445 F.2d 967, 968 n.1 (4th Cir. 1971)..

In light of the exclusion of Wallingford's testimony on the issue of the defectiveness and

9

Plaintiff's dearth of other evidence on this topic, Plaintiff cannot establish the essential first element of the breach of warranty cause of action. Specifically, Plaintiff has not provided legally sufficient evidence to demonstrate that Plaintiff's proposed BCO satisfies the risk-benefit analysis; namely, that the BCO taken as a whole would have provided safety benefits that outweighed its safety risks. Without sufficient evidence that Plaintiff's BCO satisfied this risk-benefit analysis, Plaintiff cannot establish that the absence of a BCO on the Ford Mustang at issue amounted to a defect that rendered the Mustang unreasonably dangerous. This critical defect leaves Plaintiff incapable of proving his case. Although the Court also harbors great doubts as to whether Plaintiff could establish the element of causation—namely, whether the BCO would have prevented the fire at issue in this case—Plaintiff's failure to demonstrate the first element of its cause of action is dispositive. Because reasonable minds could not differ as to this result, it is necessary for the Court to direct the verdict in favor of Defendant.

A.

Plaintiff's arguments against the directed verdict are without merit. First, Plaintiff argues that he is not required to prove the risk-benefit issue, because the Court's sanction instruction regarding consumer expectations essentially satisfies the overarching issue of defectiveness. Under Plaintiff's reasoning, the Court's instruction that "consumers expected no fires," coupled with the feasibility of satisfying these consumer expectations, already demonstrates the presence of a product defect. Plaintiff argues that a finding of consumer expectations already subsumes the issue of risk-benefit analysis, because if consumers expect "no fires," they have inherently balanced the risks and benefits of such an expectation.

10

In making this argument, Plaintiff fundamentally misunderstands the Court's ruling as to this issue. As a sanction, the Court found as a fact that "consumers expected no fires *where* such fires could be prevented by design and construction, balancing known risks and dangers against the feasibility and practicability of applying any given technology." (Emphasis added.) A critical word in this instruction is "where." Under the law of this case, consumers only expected "no fires" *where* it was clear that the risk-benefit analysis counseled in favor of preventing fires. The instruction does not imply that consumers performed a risk-benefit analysis and then determined that pursuant to that analysis, it was always best to have "no fires." Instead, it merely explains that consumers expected "no fires" where it could be shown that a given piece of "no fires" technology helped more than it hurt. For this reason, contrary to Plaintiff's argument, the Court has not ruled that "the 1999 Mustang was defective because it did not meet consumer expectations."

In actuality, the Court's instruction had the limited purpose of establishing that "plaintiff's evidence concerning consumer expectations will be legally sufficient to meet its burden on the issue of consumer expectations." As the parties are aware, consumer expectations play a significant role in the case because they, together with industry standards and government standards, can help determine whether a product defect exists. *See Alevaromangiros v. Hechinger Co.*, 993 F.2d 417, 420 (4th Cir. 1993). Because there is no relevant evidence on industry or government standards in this case, consumer expectations evidence becomes particularly significant. Courts have explained that these expectations may be established through "evidence of actual industry practices, knowledge at the time of other injuries, knowledge of dangers, published literature, and from direct evidence of what reasonable

11

purchasers considered defective." *Sexton v. Bell Helmets, Inc.*, 926 F.2d 331, 337 & 337 n.6 (4th Cir. 1991). Here, because the Court had already excluded from evidence a survey on consumer expectations and there was little useful evidence regarding industry practices, knowledge of injuries or dangers, or published literature, Plaintiff was at risk of lacking any evidence whatsoever on the significant issue of consumer expectations. The sanction instruction, therefore, did the significant work of establishing that at least *some* evidence existed on the issue of consumer expectations, which here was a critical component in demonstrating the presence of a defect. The sanction instruction did not, however, go so far as to demonstrate the presence of a product defect. Proving this element requires not only evidence that consumers expected "no fires" whenever such prevention would be reasonable, but also that the method of preventing the fire was in fact reasonable. As discussed above, analysis of this secondary point requires a further inquiry into the fire-prevention technology available and its particular risks and benefits. Without determining whether such technology helps more than it hurts, it is impossible to determine whether, in light of consumer expectations, it would be appropriate to include that technology in the Mustang at issue. It similarly would be impossible to determine whether the technology's absence constitutes a defect. Thus, the Court's instruction regarding consumer expectations in no way establishes that the Mustang at issue is defective.

Plaintiff's argument also fundamentally mischaracterizes the very question of what constitutes a product defect. The Mustang at issue is not "defective" merely because there are risks associated with its electrical system and that those risks might be minimized by the inclusion of a BCO. Indeed, "proof that a technology existed, which if implemented could feasibly have avoided a dangerous condition, does not alone establish a defect." *Sexton*, 926

12

F.2d at 336 (quoting *Jones v. Hutchinson Mfg., Inc.*, 502 S.W.2d 66, 70–71 (Ky. 1973)). Rather, the "defect" question asks whether the absence of Plaintiff's proposed BCO in the Mustang renders the car unreasonably dangerous for foreseeable use. If Plaintiff cannot reach a point of demonstrating that the Mustang, taken as a whole, is likely better off with the BCO than without it, then Plaintiff cannot satisfy his burden. Plaintiff's case, however, merely argues that the Mustang is defective because it contained a hazard of post collision fires and that a BCO would have greatly reduced the risk. Although Plaintiff has marshaled a variety of evidence on this point, none of it manages to address the essential risk-benefit issue. Even assuming that the BCO would reduce post-collision fires, the mere fact that such injuries would be reduced does not necessarily mean that the device is desirable. Rather, it is also necessary to determine if the BCO's benefit of reducing vehicle fires outweighs its risk of harm from cutting off various (potentially helpful) electrical circuits operating in the car.

Second, Plaintiff argues that even if it is required to demonstrate the presence of a defect by proving that its BCO satisfied a risk-benefit analysis, it has offered several pieces of evidence on this issue. Plaintiff points to: (1) a memo from Ford expert Kowalski downplaying the risk of increased injuries due to the BCO cutting power after accidents because blown fuses often cut off power after an accident regardless of the presence of a BCO; (2) the project by Ford experts Kowalski and Martell, discussing the "Safety & Security Solenoid" ("S3") automatic disconnect device that did not specifically identify any risk associated with the device; and (3) Ford's response to the National Highway Traffic Safety Administration's ("NHTSA") 1995 Advance Notice of Proposed Rulemaking ("ANPRM") on electrical system countermeasures, in which Ford did not mention that the risks of the device exceeded its benefits. None of this evidence,

13

however, actually demonstrates that the proposed BCO here satisfies the risk-benefit analysis. The Kowalski memo is not on point because despite its downplaying of the risks, it does not actually undertake to analyze or quantify the risk-benefit calculus for a BCO. Ultimately, the mere fact that blown fuses might already cut off power in *some* collision scenarios by no means necessarily recommends a policy of cutting off power in *all* collision scenarios. Similarly, the mere fact that Kowalski and Martell's project did not explicitly identify any risks of the S3 automatic disconnect device does nothing to prove that their project actually undertook to identify those risks, much less prove that the BCO at issue ultimately satisfies the risk-benefit calculus. Finally, Ford's response to the 1995 ANPRM is not useful because Ford was not required to engage in a costly and complex risk-benefit analysis of hypothetical BCO models before offering NHTSA a preliminary comment on a nascent safety regulation proposal. Indeed, all of Plaintiff's evidence suggests that no one has undertaken the essential project of quantifying the risks that Plaintiff's BCO would create and compare them to its benefits.

For these reasons, Plaintiff has not provided sufficient evidence to demonstrate that his proposed safety technology satisfies the risk-benefit analysis. Without such evidence, Plaintiff cannot demonstrate that the BCO would have played a valuable safety role on Ford Mustangs. And in light of this fact, Plaintiff cannot demonstrate that the absence of the technology could possibly render the Ford Mustang at issue defective. Having failed to satisfy this first element of its cause of action, Plaintiff's case must fail.

B.

Although the basis of the Court's ruling today is Plaintiff's failure to prove the presence

14

of a product defect, it should be noted that Plaintiff's case also contains serious and potentially fatal flaws regarding the issue of causation. In order to prove the element of causation, Plaintiff needs to demonstrate not only that the fire was of electrical origin, but also that the fire would in fact have been prevented if Plaintiff's proposed technology had been in place. Plaintiff's proposed BCO protected certain so-called "critical circuits" providing post-collision safety benefits, such as hazards and door locks, allowing them to keep running even after a collision. Both of Plaintiff's experts on causation, Wallingford and Charles Crim, indicated that they could not identify the particular circuits in the wiring harness that started the fire. Because of this fact, neither can possibly state with a reasonable degree of scientific certainty that the circuits that caused the alleged high-resistance fault were not in fact "critical circuits" that the BCO would have allowed to continue running after the accident. Because of this fact, Plaintiff cannot offer anything more than speculation as to whether the BCO actually would have prevented the fire at issue.

In response, Plaintiff argues that the proposed BCO design would have removed the critical circuits from the wiring harness itself, thereby isolating them from the greater fire risk that the wiring harness created. Yet this argument is not responsive to the basic issue of causation, namely, whether the critical circuits would have caused the fire even if the Mustang had contained a BCO. Even if the critical circuits are removed from the wiring harness, they still would have to remain somewhere in the vehicle, and Plaintiff's proposal of wrapping these circuits in protective metal sheathing in no way demonstrated that they would in fact be safer than in the wiring harness. In fact, as Ford pointed out on cross examination, the proposed metal sheathing could easily make contact with the circuit itself in a crash scenario, and it had even

15

more conductivity than the copper used in circuits in the wiring harness. Moreover, Plaintiff also has argued that an ultimate determination of what circuits were "critical" would be up to the Ford engineers. For this reason, Plaintiff's current proposed alterative design, which has already designated the critical circuits, cannot possibly demonstrate whether it would be feasible and effective to use protective sheathing on other potentially critical circuits, given their position and functionality within the vehicle. In this sense, it is by no means clear that even with the BCO installed on the Mustang, some critical circuit could not have caused the fire in Plaintiff's accident. For this reason, Plaintiff's inability to identify which circuits caused the alleged high-resistance fault responsible for Plaintiff's fire is likely a fatal flaw. Nevertheless, the Court declines to reach this issue in light of its previous ruling regarding Plaintiff's failure to demonstrate the element of defectiveness.

IV.

In conclusion, because Plaintiff's expert Jerry Wallingford lacked an objective scientific basis for his expert opinion on the issue of defectiveness, Ford's motion to strike his testimony shall be granted in part. In light of Wallingford's excluded testimony and Plaintiff's lack of other evidence on this point, Plaintiff cannot demonstrate the essential element of defectiveness. Accordingly, Defendant's motion for a directed verdict shall be granted, and this matter shall be stricken from the docket.

A written Order shall issue this day.

16

ENTERED: _/s/ Norman K. Moon_
U.S. District Judge

6/27/2005
Date