CLERK'S OFFICE U.S. DIST. COURT
AT DANVILLE, VA
FILED

SEP - 2 2005

JOHN F. CORCORAN, CLERK
BY: /s/ Sam
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
DANVILLE DIVISION

JOHN WITTEN TUNNELL,

                       *Plaintiff,*

v.

FORD MOTOR COMPANY,

                       *Defendant.*

CIVIL ACTION NO. 4:03-CV-00074

MEMORANDUM OPINION

JUDGE NORMAN K. MOON

This matter is before the Court on Plaintiff's Motion for a New Trial. For the reasons that follow, the motion shall be denied.

I.

On October 25, 2004, the Magistrate Judge entered a Report and Recommendations regarding Plaintiff's first motion for sanctions. The Magistrate Judge recommended imposing a jury instruction stating that the following fact had been established: "[w]hether in a collision or non-collision context, consumers expected that there should be "No Fires!" in passenger automobiles as of 1988."

After this proceeding, but before trial, Plaintiff filed two Motions for Default Judgment based on Ford's alleged discovery abuses. Plaintiff filed the first of these on February 25, 2005.

1

In an April 22, 2005 opinion on this motion, the Magistrate Judge recommended denying the motion, but he also ordered that Ford produce any documents in its possession or control that referred to the operation of the inertia switch used on Jaguar motor vehicles. In response, Ford produced five pages of additional material concerning the Jaguar inertia switch. Arguing that this Ford production violated the April 22, 2005 Order, Plaintiff again moved for default judgment on May 12, 2005.

Jury trial was conducted from May 25 to June 13, 2005. At the beginning of trial, in consideration of the outstanding sanctions motions, the Court adopted in part the Magistrate Judge's October 25, 2004 Report and Recommendations. Modifying the sanction language proposed by the Magistrate Judge, the Court stated that it would impose the following jury instruction as a sanction: "Consumers by 1988 expected that there would be no fires in collision and non-collision situations where such fires could be prevented by design and construction, balancing known risks and dangers against the feasibility and practicability of applying any given technology."

On the morning of June 13, 2005, Plaintiff filed a supplemental motion for sanctions Pursuant to Federal Rule of Civil Procedure 37(b)(2) for Ford's Failure to Comply with the Court's Order of April 22, 2005. Hours later, the Court granted Defendant's motion for a directed verdict. Subsequently, the Court entered a written Memorandum Opinion explaining its reasons for directing the verdict. Soon thereafter, Plaintiff filed the present motion for a new trial.

2

II.

A.

Plaintiff first argues that a new trial is justified because this Court's imposing of a risk-benefit burden upon Plaintiff was a prejudicial error of law and therefore excluding the testimony of Plaintiff's expert Jerry Wallingford on that basis was an abuse of discretion. As a threshold matter, however, it should be noted that Wallingford's testimony failed even before reaching the point of the risk-benefit issue. As the Court discussed in its Memorandum Opinion regarding the directed verdict, Wallingford's opinion never actually claimed that a defect existed. Instead, Wallingford reaffirmed his opinion from deposition that although the Mustang did not have a battery cutoff device ("BCO"), "I'm not going to call it defective," and that he was merely saying the Mustang "would have been a safer vehicle" with a BCO. This admission effectively conceded the entire purpose of Wallingford's testimony on this topic, for it admits that his earlier statements were never meant to assert that the absence of Plaintiff's BCO actually constitutes a vehicle defect. To satisfy his burden in a product defect case, Plaintiff must do more than merely demonstrate that the proposed alternative would make the product "safer" than it currently is. *See, e.g., Sexton v. Bell Helmets*, 926 F.2d 331, 336 (4th Cir. 1991).

Plaintiff's attempt to resuscitate this inadequate testimony ultimately was unsuccessful. Plaintiff asserts that Wallingford's statements should be understood in the context of his other deposition testimony, which read in part as follows:

> Q: Okay. Are you saying that the Ford is defective, the 1999 Mustang, for not having one [a BCO]?
>
> A: I'm saying this vehicle was unreasonably dangerous relative to this event and relative to any post-collision fire that will be in—that it would be in, because it does not, did not

3

have a battery cut-off switch.

This explanation, such as it is, does little to improve the value of Wallingford's testimony. Even assuming this language was actually meant to assert the presence of a defect (which is far from clear), his claim that a vehicle is unreasonably dangerous "relative to" a particular type of event still does not speak to the basic concept of legal defectiveness. Defectiveness analysis considers whether a product is "unreasonably dangerous for ordinary or foreseeable use." *Alevromagiros v. Hechinger Co.*, 993 F.2d 417, 420 (4th Cir. 1993). As discussed in the Memorandum Opinion, this "foreseeable uses" standard necessarily requires experts to take a broad view of the product they analyze. Because the foreseeable uses of some products are wide-ranging, a product may require multiple—and potentially competing—design elements to protect against the various foreseeable uses of the product. Precisely because of this fact, one design element protecting against a foreseeable use can easily frustrate or even impair the value of another measure protecting against a different foreseeable use. For this reason, a product designer may argue in its defense that a proposed alternative design actually increases the risk that injury will result from a different, but equally foreseeable, use of the product. When such an argument is made, a plaintiff's expert cannot simply make a defectiveness judgment based upon only one particular type of accident. Rather, he must analyze whether the current design, taken as a whole, reasonably protects against the other injuries that could occur due to foreseeable uses. This result is a necessary consequence of the "foreseeable use" standard because any other standard would render a designer susceptible to inconsistent judgments on defectiveness. In one lawsuit, the designer could be liable for failing to include a certain protective device; in another, he could be liable for choosing to include it. Here, Ford

4

unquestionably argued that Wallingford's proposed device would impose safety risks rendering the Mustang more dangerous. Because Wallingford never addressed the question of whether the vehicle taken as a whole was unreasonably dangerous for ordinary or foreseeable uses, his opinion was meaningless on the issue of defectiveness.

B.

Ultimately, the preceding analysis merges with the issue Plaintiff raises in his motion regarding the risk-benefit analysis. The risk-benefit analysis is not, as Plaintiff argues, some additional technical hurdle that this Court is imposing where none existed before. Rather, it is a basic concept imbedded in any defectiveness analysis, requiring that a proposed alternative design actually cure a product of its alleged defects. Contrary to Plaintiff's contention, Virginia along with the Third Restatement of Torts does require evidence from a plaintiff that an alternative design truly provides more benefits than risks.

Although the Third Restatement does not require a plaintiff "to establish with particularity the costs and benefits associated with adoption of the suggested alterative design" in light of the "inherent limitations on access to relevant data," it nevertheless clearly does contemplate that a plaintiff will produce some affirmative evidence as to the risk-benefit analysis. As Plaintiff acknowledges, the Restatement is quite clear on this point:

> When evaluating the reasonableness of a design alternative, the overall safety of the product must be considered. It is not sufficient that the alternative design would have reduced or prevented the harm suffered by the plaintiff if it would have introduced into the product other dangers of equal or greater magnitude.

5

Restatement (Third) of Torts: Products Liability § 2 cmt. f (1997).[1] Plaintiff acknowledges that some jurisdictions have interpreted the Third Restatement to require proof than an alternative design has passed a risk-benefit analysis, but he argues that neither the Virginia Supreme Court nor the Virginia General Assembly has expressly adopted the Third Restatement. Even assuming *arguendo* that Virginia has rejected express adoption of the Third Restatement in its entirety, however, this fact alone does not suggest that principles from the Third Restatement are not integrated in Virginia common law. As with any area of law, persuasive authority in the form of case law from other jurisdictions and restatements is instructive in identifying Virginia common law rules.

It is true that in Virginia cases, the law does not always require quantitative evidence as to the risk-benefit analysis. *Ford v. Bartholomew*, 224 Va. 421 (1982), upheld expert testimony that a gear shift "does not conform with what I consider to be safe engineering standards," even when that expert had not offered any risk-benefit test results to verify his theory. Instead, the expert had relied upon a comparison of the gear shift to the design of one in an Oldsmobile, as well as several other points of analysis: instruction manuals and data compiled by the National Highway Traffic Safety Administration; consultation with other experts; experimentation with the transmission systems in a Lincoln, Cadillac, and Ford; observation of mechanics as they disassembled transmission components; and disassembly of one transmission personally. In light of this research, the Court concluded that his opinion was based on a proper foundation and

---

[1] It may not always be contested whether a proposed alternative design aimed at reducing a particular risk would introduce into the product other dangers of equal or greater magnitude. *See infra* note 2 and accompanying text. When it is, however, analysis of the risks and benefits of the proposed device, as recognized by the Third Restatement, becomes significant.

6

that it was for a jury to determine what weight to accord his testimony. *Id.* at 430. Similarly, other Virginia cases have not required quantitative risk-benefit analysis when there is evidence that the proposed alternative design was used in other products. *See Lust v. Clark*, 792 F.2d 436 (4th Cir. 1986) (a proposed alternative pinch point placement and guarding device were implemented by other manufacturers); *Blevins v. New Holland*, 128 F. Supp. 2d 952 (W.D. Va. 2001) (a plaintiff's alternative emergency stop design, while not used on agricultural equipment, was used on industrial equipment); *Chestnut v. Ford Motor Co.*, 445 F.2d 967 (4th Cir. 1971) (evidence of an alternative device more reliable than a solenoid was found sufficient to impose liability for a malfunctioning headlight closing lid).

Plaintiff argues that these Virginia cases demonstrate that he need not provide a risk-benefit analysis here, where the proposed alternative design is already in use. This argument fails on two grounds. First, it is simply not the case that Plaintiff's proposed alternative design here was already in use. Unlike the above cases, Plaintiff is proposing the use of an inertia switch in a protective manner that had never been pursued by any other producer before. Specifically, the inertia switch would cut off not just a particular circuit, such as a fuel pump, but *all circuits* in the car except a few so-called critical circuits. Further, based on the evidence before the Court, no other vehicle in the industry has such a device. Further, Plaintiff's own proposed design did not even identify exactly which "critical" circuits would be excepted (preferring instead to impose that onus upon the defendant), so it is simply impossible to say that the proposed design is the same as one already in use. For this reason, Plaintiff cannot maintain that this case is analogous to those cited above, where the fact that a proposed design was previously in use already provided adequate evidence as to the risk-benefit analysis. Second,

7

and equally important, the above cases are distinguished because their proposed alternative designs did not create potential new safety risks. In each of the cases Plaintiff cites, no defendant had argued that the plaintiff's proposed alternative design imposed new risks upon consumers that would have outweighed their potential safety benefits. In such circumstances, the defect analysis was simple, for it was effectively conceded that the proposed device would provide a net safety benefit.[2] Yet when the potential drawbacks of a proposed alternative design are at issue, as here, evidence that the devices benefits truly outweigh its risks becomes critical. The cases cited in Plaintiff's brief do nothing to undermine this concept.

Accordingly, Plaintiff is incorrect in contending that Virginia does not require a risk-benefit analysis in these circumstances. Ultimately, the necessity of establishing that a proposed alternative design would satisfy the risk-benefit analysis is a matter of common sense. When a defendant argues that a proposed alternative device imposes safety risks, a plaintiff necessarily must produce some evidence that the proposed device will help more than it hurts. Without such evidence, it is impossible to determine whether the proposed alternative would truly cure a product of its alleged defect, or instead merely substitute one defect for another. One need not refer to the Third Restatement, academic commentary, or interpretive decisions to understand this basic point.

For these reasons, it was not prejudicial error for this Court to exclude Wallingford's defectiveness testimony. Ford had argued that the proposed alternative design imposed serious

---

[2] *See, e.g., Lust v. Clark*, 792 F.2d 436 (4th Cir. 1986), where there was no argument that a proposed alternative pinch-point design introduced its own safety risks, and *Blevins v. New Holland*, 128 F. Supp. 2d 952 (W.D. Va. 2001), where there was no evidence that a proposed emergency stop design could potentially create new risks for riders.

8

safety risks. For Wallingford to argue that the Mustang was defective for not incorporating his proposed BCO, he needed to satisfy himself that the BCO's potential risks truly were outweighed by its benefits. To be sure, evidence of the risk-benefit analysis need not always come in the form of hard or quantitative evidence.[3] But certainly it must come in some form. Because Wallingford did not provide such evidence, analyze it, or even undertake to do so, his opinion as to defectiveness was meaningless and thus properly excluded. In light of this exclusion, and Plaintiff's dearth of other evidence on the issue, the Court's directed verdict was proper.

C.

Plaintiff also requests a new trial based on the claim that this Court has not yet ruled upon "three critical discovery matters concerning Ford's continued withholding of evidence about consumer expectations of NO FIRES and NO IGNITION SOURCES in collisions, and Ford's continued withholding of evidence about the operation and characteristics of inertia switches on Jaguars." Plaintiff argues that in light of the Court's requirement that he satisfy a risk-benefit analysis, he should be granted relief under these motions as they sought enforcement of discovery requests that went to the risk-benefit issue.

This claim also must fail. The two motions for default judgment preceded the Court's sanctions hearing of May 25, 2005, where this Court adopted in part the Magistrate Judge's proposed sanction instruction. Implicit in the Court's ruling of that date was a denial of

---

[3] The Court declines today to impose any bright line standard on this issue. The nature and the quality of risk-benefit evidence needed to survive directed verdict is necessarily a fact-specific question best reserved for case-by-case consideration.

9

Plaintiff's default judgment motions, which essentially were seeking further relief from the Court. For the reasons discussed in the Magistrate Judge's Report and Recommendation of April 22, 2005, default judgment is not an appropriate remedy for Ford's alleged discovery violations described in the First Motion for Default Judgment. Furthermore, the Court does not find that the other alleged discovery violations described in the Second Motion for Default Judgment (Docket No. 436) demonstrate the need for a default judgment. Although Plaintiff is adamant that Ford's claim that certain requested Jaguar documents are not available is beyond belief, this Court disagrees and is not prepared to grant sanctions on this basis. The Court's intention in granting the limited sanctions that it did on May 25, 2005 was to dispose of these two motions as well.

For this reason, the Court takes Plaintiff's subsequent June 13, 2005 Supplemental Brief in Support of Plaintiff's Motion for Sanctions (Docket No. 509) essentially as a motion for reconsideration. Again, the Court sees no reason to impose sanctions based on the argument in the brief. The "logic units" at issue in the cross-examination of Samuel McKnight are of dubious probative value for either side in the case and they ultimately have no bearing on the failures of Wallingford's testimony that were the basis of this Court's directed verdict.

III.

For the foregoing reasons, Plaintiff has not satisfied the burden of establishing the need for a new trial. Plaintiff's motion accordingly shall be denied.

An appropriate Order shall issue.

10

ENTERED: /s/ Norman K. Moon
U.S. District Judge

September 2, 2005
Date